IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION

|  |  |
|---|---|
| ROBERT REPA AND JEAN REPA, HUSBAND AND WIFE, | ) ) ) |
|  | ) 1:19-cv-00101-RAL |
| Plaintiffs | ) ) RICHARD A. LANZILLO |
|  | ) UNITED STATES MAGISTRATE JUDGE |
| vs. | ) ) |
|  | ) MEMORANDUM OPINION ON |
| FRANK NAPIERKOWSKI, HILLTRUX TANK LINES, INC., | ) PLAINTIFFS' MOTION IN LIMINE TO ) PRECLUDE TESTIMONY OF DANIEL ) CONNELLY [ECF NO. 75] |
|  | ) ) |
| Defendants | ) ) |

MEMORANDUM OPINION

Plaintiffs have moved in limine to exclude from trial all testimony of Defendants' proffered accident reconstruction expert, Daniel Connolly (Connolly). ECF No. 75. They argue that Connolly lacks the qualifications necessary to reach his conclusions, that some of Connolly's conclusions lack an adequate foundation, and that his conclusions were not the product of reliable principles and methods and, therefore, his proposed testimony fails to satisfy the requirements of Federal Rules of Evidence 702, 703, and 705 and the standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny. *Id.*

Connolly is the president of Pittsburgh Collision and Reconstruction Services, LLC. ECF No. 75-2, p. 1 (Connolly's C.V.). He has held this position since 2009. He holds an accreditation (#2286) from the Accreditation Commission for Traffic Accident Reconstruction (ACTAR). *Id.*, p. 9. He is also the owner and president of Commercial Vehicle Safety

1

Solutions, LLC. From 2005 to 2008, he was the owner and managing member of A & C Collision Consulting.

Before his consulting businesses, he worked for the Pittsburgh Bureau of Police from 1994 to 2015. *Id.*, pp. 1-2. He had "general" police duties for the first two years. For about the next fourteen years, he worked in the Traffic Division, where his duties included "general traffic control in the Downtown area as well as" at large, special events, speed enforcement, "Intoxilyzer Operation, and Collision Investigation." *Id.*, p. 2. For about the next five years, he worked in the collision investigation unit as a collision investigation coordinator. His duties included performing on-scene crash investigations and reconstructing vehicle, motorcycle, pedestrian, and commercial vehicle crashes. *Id.*, p. 1. For the next two years, as a sergeant, he supervised between twenty to twenty-four police officers (apparently not in accident reconstruction). For the last approximately seven years of his time as a police officer, he served as a collision investigation supervisor "overseeing and reconstructing all Fatal/Critical Crashes occurring in the City of Pittsburgh." *Id.*, p. 1. Concurrently, he was the supervisor of the commercial vehicle enforcement unit conducting inspections as a certified motor carrier enforcement inspector. Since 1996, he has worked on more than 1500 crash investigations and civil reconstruction cases (his C.V. does not specify a breakdown). *Id.*, p. 10.

He is a high school graduate who has attended some college. *Id.*, p. 9. He has lectured on crash reconstruction to Duquesne University students in the Forensic Science Master's Program three times. *Id.*, pp. 2-3. He has been an instructor in accident investigation for the City of Pittsburgh and Allegheny County police academies, Indiana University of Pennsylvania, Michigan State University, and Carnegie Mellon University, at various times from 2000 to 2016.

*Id.*, p. 3. He also has training in retrieving and interpreting data from vehicle computers. *Id.*, pp. 3-4.

Connolly reviewed various materials when preparing his report. He reviewed the crash report prepared by the Pennsylvania state police. ECF No. 75-1, p. 1. He reviewed the depositions of Frank Napierkowski, Robert Repa, Steven Klakamp (and his transcribed statement), EMT Robert Proper, Paramedic Katie Sherretts, Matthew Garver, Fire Chief Jeffrey Murdock, fire police officer Dale Dolan, and Hilltrux Safety Director Marvin Carroll. He also read the report of David Bizzak (Bizzak), plaintiffs' proffered accident reconstruction expert. *Id.*, p. 1. He also visited the scene and took measurements. *Id.*, pp. 1, 6.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. "Rule 702 has three major requirements: (1) the proffered witness must be an expert, *i.e.*, must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge [, i.e., reliability]; and (3) the expert's testimony must assist the trier of fact [, i.e., fit]." *United States v. Schiff*, 602 F.3d 152, 172 (3d Cir. 2010) (alterations in original) (quoting *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008)).

Plaintiffs have challenged Connolly's qualifications. An expert witness must demonstrate "specialized knowledge" in the subject matter of his testimony. *See Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998). Qualifications include "specialized expertise." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (quoting *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). A "broad range of knowledge, skills, and training qualify an expert," including "practical experience as well as academic training and credentials." *Waldorf*, 142 F.3d at 625 (quoting *Paoli*, 35 F.3d at 741-42). "This liberal policy of admissibility extends to the substantive as well as the formal qualifications of experts." *Pineda*,

3

520 F.3d at 244 (citing *Paoli*, 35 F.3d at 741). Further, "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Id.* (quoting *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996)). However, "at a minimum, a proffered expert witness …must possess skill or knowledge greater than the average layman." *Waldorf*, 142 F.3d at 625.

The Court finds that Defendants have met their burden to show that Connolly is qualified in accident reconstruction by his "specialized expertise." *Pineda*, 520 F.3d at 244. For about twelve years as a policeman, he investigated numerous kinds of vehicle accidents, performed accident reconstruction, and supervised others in that work. Since then, he has consulted as in accident reconstruction for nearly thirteen years, trained others in accident reconstruction, and received relevant trainings and certifications. In addition, his years of experience directing traffic as a police officer qualify him as an expert on the duties of pedestrians as well as the responsibilities of individuals directing traffic.[1] The next question for the Court is whether those qualifications are reasonably related to his opinions and conclusions he proposes to offer at trial.

Rule 702's second requirement requires that "the process or technique the expert used in formulating the opinion is reliable." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994). Therefore, "the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation;' the expert must have 'good grounds' for his or her belief." *Paoli*, 35 F.3d at 742 (quoting *Daubert v. Merrell Dow*

---

[1] The Court tends to agree that at least some of Connolly's opinions on the duties of pedestrians amount to "[g]eneralized common sense," rather than admissible expert opinions, and, thus, appear to provide no help to the jury. *See Fedor v. Freightliner, Inc.*, 193 F. Supp. 2d 820, 832 (E.D. Pa. 2002). However, the Court will determine the admissibility of these "opinions" on a question-by-question basis at trial.

4

*Pharm., Inc.*, 509 U.S. 579, 590 (1993)). Assessment of whether testimony is based on a reliable foundation is "flexible." *Daubert*, 509 U.S. at 594. For the third requirement, the proffered expert testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985). "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591-92. Although the applicable standard for determining "fit" is "not that high," it is nonetheless "higher than bare relevance." *Paoli*, 35 F.3d at 745.

The District Court is not a fact finder in this role. Instead, the focus appropriately goes to the methodology of the expert to "satisfy itself that 'good grounds' exist for the expert's opinion." *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) (citing *Daubert*, 509 U.S. at 590); *In re TMI Litigation*, 193 F.3d 613, 713 (3d Cir. 1999) (district court should not conflate "its gatekeeping function with the fact-finders' function as the assessor of credibility"). "The District Court has broad discretion in determining the admissibility of evidence, and 'considerable leeway' in determining the reliability of particular expert testimony under *Daubert*." *Walker v. Gordon*, 46 Fed. Appx. 691, 694 (3d Cir. 2002) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152-53 (1999)). *See also Hamling v. United States*, 418 U.S. 87, 108 (1974). Rule 702 "has a liberal policy of admissibility." *Kannankeril v. Terminix Intern., Inc.*, 128 F.3d 802, 806 (3d Cir. 1997). The party that proffers the expert testimony is not required to prove to the court that the expert's conclusion is correct. *See Mitchell*, 365 F.3d at 244 (citation omitted).[2]

---

[2] The Third Circuit has listed several factors it deems "important" in assessing an expert's methodology:

5

Connolly's "opinions" are stated in eleven bullet points and the concluding paragraph of his report. ECF No. 73-3, pp. 8-9. These are included in an Appendix to this Opinion and numbered for clarity. The record developed by the parties and provided to the Court is sufficient to allow the Court to decide this issue without an evidentiary hearing under *Daubert*. *See Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 417-18 (3d Cir. 1999). The Court will analyze each opinion under the standards explained above.

All "opinions" purportedly stated in bullet points one through five summarize witness testimony and draw credibility conclusions (except for one discussed below). Plaintiffs correctly argue that this requires their exclusion [ECF No. 76, pp. 6-7] because "[c]redibility determinations are for the jury." *United States v. Jannotti*, 673 F.2d 578, 598 (3d Cir. 1982) (en banc). Furthermore, Connolly's selective summary of party and witness testimony and other evidence will not assist the jury. Thus, the Court will exclude from evidence Connolly's quotation or summarization of testimony and his credibility assessment as set forth in paragraphs one through five of the Opinion section of this report. *See Coney v. NPR, Inc.*, 312 Fed. Appx. 469, 474 (3d Cir. 2009) (quoting *United States v. Adams*, 271 F.3d 1236, 1245 (10th Cir. 2001)) ("[T]he credibility of witnesses is generally not an appropriate subject for expert testimony."). This ruling also applies to the summaries of testimony on pages two through seven of his report. *See Coney*, 312 Fed. Appx. at 471, 474. Although Connolly may permissibly rely on inadmissible deposition testimony to the extent it rationally informs his opinions and it is the

---

(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n.8 (3d Cir. 1994).

type upon which experts in his field would reasonably rely in forming their opinions, he may not serve as a simple conduit for introducing hearsay or other inadmissible evidence. *See* Fed. R. Evid. 703.

Connolly opined in bullet point four that "Mr. Repa was trained in traffic control and should have had his attention on the passing truck and trailer." Plaintiffs argue that this opinion should be excluded because Connolly acknowledged at deposition that does not know what training Mr. Repa or other fire police officers received. ECF No. 76, pp. 4-5. The Court agrees.

An "expert's testimony must be accompanied by a sufficient factual foundation before it can be submitted to the jury." *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 98 (3d Cir. 1983). In their responsive brief, "Defendants concede that Mr. Connolly is not an expert is [sic] training fire police, *per se*." ECF No. 102, p. 6. Connolly acknowledged that he does not know the substance of Mr. Repa's training as a volunteer fire police officer. Thus, he has no foundation upon which to opine that Mr. Repa failed to follow his training and any proposed testimony by him to this effect is inadmissible. *See Benjamin v. Peter's Farm Condominium Owners Ass'n*, 820 F.2d 640, 643 (3d Cir. 1987) (district court improperly admitted expert testimony that "lacked the proper foundation and sufficient factual predicates"); *Elcock v. Kmart Corp.*, 233 F.3d 734, 755 (3d Cir. 2000).

Connolly may permissibly opine that "[c]ommercial operators have a duty to keep a look out" and that a "driver does not have a duty to stop his travel if he does not see a threat in his mirrors," as he proffers in bullet point six. These opinions appear to be sufficiently grounded in Connolly's expertise as an accident reconstruction expert, rationally related to such expertise, relevant to the applicable standard of care. However, he may not testify that Napierkowski acted in a particular way leading up to the accident because he has engaged in no expert analysis or

7

methodology to determine the behavior of Napierkowski or Mr. Repa at the accident scene. Instead, he proposes simply to repeat Napierkowski's version of his behavior and that of others, which is impermissible. *See Jannotti*, 673 F.2d at 598 ("[c]redibility determinations are for the jury."); *Benjamin*, 820 F.2d at 643 (expert testimony must have "sufficient factual predicates"). In summary, Connolly may not express an opinion or otherwise testify factually that Napierkowski or any other person acted or failed to act in a particular manner on the night of the accident.[3]

In bullet point seven, Connolly opines regarding the visibility of Mr. Repa's safety vest and his LED traffic wand. Connolly may acknowledge disputed testimony over whether Mr. Repa was wearing a reflective vest or a lighted vest and testify regarding the relative visibility of each type of vest based on assumed facts that are supported by the record. Connolly may not opine that the "LED traffic wand *could have been* to Mr. Repa's right side" and that "[w]ith the wand at this position, the wand *would be obstructed* by his body" [ECF No. 73-3, p. 9 (emphasis added)] because this commentary is speculative and not expert opinions that Connolly can offer to a reasonable degree of professional certainty. *See Schneider*, 320 F.3d at 404 (3d Cir. 2003) (expert opinions must be "based on the methods and procedures of science rather than on subjective belief or unsupported speculation"). Connolly is similarly not permitted to speculate that the flashing lights of the LED wand (or vest) "*could be* easily be [sic] mistaken for the trailer flashers." ECF No. 73-3, p. 9 (emphasis added). In response to questions, Connolly may testify, however, regarding factors affecting the visibility of a person wearing each type of vest at the

---

[3] Connolly may express an opinion regarding whether Napierkowski's conduct complied with the applicable standard of care based on presented assumed facts supported by the record.

8

scene such as the extent of natural light and artificial light sources, and the trailer's flashing lights.

Connolly may also testify to his opinion in bullet point eleven that the intersection where the accident occurred has "adequate size to handle a turning 57-foot tractor trailer combination." ECF No. 73-3, p. 9. His experience in accident reconstruction qualifies him to draw this conclusion. The record supports that he relied on sufficient facts and data to offer the opinion—specifically, his measurements of the intersection in bullet points ten and eleven and his reliance on Bizzak's turning radii calculations (noted in bullet point nine). And Defendants have met their burden to demonstrate that he used reliable methodology to reach his conclusion: placing a model of the tractor and trailer into a computer-aided drawing (CAD) diagram of the intersection and using the measurements of the intersection and turning radii calculations to determine the vehicle's fit in the intersection.

Connolly's final opinion, numbered in the Appendix as number twelve, is impermissible. His opinion that Mr. Repa failed to follow his training about where to move in the intersection during Napierkowski's turn lacks foundation, as discussed above. *See Benjamin*, 820 F.2d at 643. His conclusion that Mr. Repa's failure to follow his training caused the accident is inadmissible for the same reason. *Id.*

Plaintiffs have also moved to exclude Connolly's calculation of the time it would have taken for Napierkowski's tractor trailer to make the turn through the intersection at the time of the accident. ECF No. 75, p. 6. Connolly testified that once Napierkowski began to drive (after he stopped and conversed with Mr. Repa), it would have taken him seven seconds to reach his stopping point. ECF No. 75-3, pp. 55–59 (Connolly Depo.). Connolly used the following formula shown in this figure:

9

$$t = 0.249 \times \sqrt{\frac{D}{f}}$$

Connolly utilized this key:

- t = The Time in Seconds.
- 0.249 = A Constant
- D = The Distance in Feet
- $f$ = The Acceleration/Drag Factor.

Connolly testified that he has used this formula throughout his career.[4] ECF No. 75-3, p. 57. Plaintiffs have not proffered disputed that formula is one means of calculating speed. The Court concludes that Defendants have minimally met their burden that this is a reliable method of calculating the time it takes for a tractor trailer to travel a specified distance. *See Kumho*, 526 U.S. at 150 ("inquiry into the expert's reliability may focus upon personal knowledge and experience").

District courts must "scrutinize" whether the "principles and methods" employed by an expert "have been properly applied to the facts of the case." *Kumho Tire*, 526 U.S. at 157. To fill in the formula's distance component, Connolly utilized the deposition testimony about how far Napierkowski travelled between starting and stopping. To fill in the acceleration/drag component, Connolly relied upon a research article published in COLLISION: THE

---

[4] It is true that this formula does not appear in Connolly's report. Although Plaintiffs' motion says that "[w]hen asked to recite the formula, Mr. Connolly was unable to do so," ECF No. 75, p. 6, review of the deposition shows that Plaintiffs' counsel did not specifically ask this question. In response to the question "What calculations did you use to calculate that [seven-second figure]? What equation did you use to calculate that?", Connolly responded, "I used the time distance one that utilizes acceleration rate and distance." ECF No. 75-3, p. 56. Plaintiffs' counsel did not follow-up and ask Connolly to provide the precise formula. After Plaintiffs' moved to exclude Connolly's testimony, Defendants provided a copy of a piece of paper purporting to show Connolly's calculations (dated the day before his deposition). ECF No. 102-10, p. 10.

10

INTERNATIONAL COMPENDIUM FOR CRASH RESEARCH.[5] That article includes the average acceleration for tractor trailers charted by distance travelled and weight of the tractor trailer. ECF No. 102-10, p. 6. For the weight value, Connolly relied upon deposition testimony. For the distance value, he "utilized the measured distance that I could get from my CAD drawing." ECF No. 75-3, p. 58. To create his CAD, he relied upon the measurements taken by him and Bizzak, Bizzak's calculations of the turning radii of the tractor and trailer, and deposition testimony. ECF No. 75-3, pp. 126–33. Thus, Connolly's methodology is distinguishable from that at issue in the unpublished case relied upon by Plaintiffs, *Materials Tech., Inc. v. Carpenter Tech. Corp.*, No. 01-2965 (SRC) (D.N.J. June 28, 2005), where the court excluded an expert's testimony because he was unable to produce the formula or data underlying his conclusions. *See* ECF No. 102-1, pp. 23–25 (*Materials Tech* attached). *See also Oddi v. Ford Motor Co.*, 234 F.3d 136, 156 (3d Cir. 2000) (affirming exclusion of opinions by an accident reconstruction/design engineer expert opinion when the methodology was not more than a "haphazard, intuitive inquiry"). Here, Defendants have adequately demonstrated that Connolly's calculation of the time it took Napierkowski to execute the turn within the intersection is the product of a "reliable methodology" and "reliably flow[s] from that methodology and the facts at issue." *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 152 (3d Cir. 1999).

---

[5] David A. Stopper, *Determining A "Best Effort" Heavy Truck Acceleration Rate Based on Time, Weight & Distance*, COLLISION: THE INTERNATIONAL COMPENDIUM FOR CRASH RESEARCH at 42, Vol. 5, Issue 2 (2010); ECF No. 102-10. Plaintiffs also argue that Connolly used an unreliable method when relying on the information in this article because he found the article through a search on Google and said that he "th[ought] one of the authors was Dave Stomper." ECF No. 76, p. 17; ECF No. 75-3, p. 57. The argument about using Google to find research is frivolous. The Court also finds that this is the type of material an accident reconstruction expert would reasonably rely upon in the course of coming to a conclusion about the speed of a truck. *See* Fed. R. Evid. 703; *Eclipse Elecs. v. Chubb Corp.*, 176 F. Supp. 2d 406, 412 (E.D. Pa. 2001) (an expert "may rely on the research, studies, and expertise of others, so long as they are of the sort of information regularly relied on by experts in the field.").

Challenges to Connolly's conclusions based on purported inaccuracies in the data he assumed or relied upon in apply the relevant formula, while proper subjects for cross-examination, go to the weight of the evidence, not its admissibility. *Lynn ex rel. Lynn v. Yamaha Golf-Car Co.*, 894 F. Supp. 2d 606, 619 (W.D. Pa. 2012). As *Daubert* notes, "[r]igorous cross-examination, presentation of contrary evidence, and careful instructions on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Instead of exclusion, examination at trial on the variables affecting his calculation can allow the jury to evaluate this opinion.

For these reasons, Plaintiffs' Motion in Limine to Preclude Testimony by Defendants' Expert, Daniel Connolly, will be granted in part and denied in part. A separate order follows.

Dated this 13th day of May, 2022

BY THE COURT:

_____
RICHARD A. LANZILLO
UNITED STATES MAGISTRATE JUDGE

APPENDIX

**Opinion:**

After reviewing and analyzing the provided information, I have made the following opinions on the cause of this crash:

1. After a conversation between Robert Repa and Frank Napierkowski about detouring Napierkowski tractor trailer, Robert Repa stepped back and watched the tractor trailer start to make a slow speed turn.
2. Mr. Repa testified that he backed against the guiderail and watched the trailer getting close to him, but he did not move. He testified that as the trailer tires ran over his feet, he was thrown under or over the guiderail into a culvert. Based on the testimony of Fire Police Officer Steven G. Klakamp, Frank Napierkowski, EMT Robert Proper and Paramedic Katie Sherretts, Mr. Repa did not get thrown over the guiderail, Mr. Repa instead was impacted and fell to the roadway.
3. Robert Repa testified that he was wearing a blinking safety vest. Testimony by Fire Police Officer Steven G. Klakamp contradicts Repa's testimony about his flashing vest. Klakamp testified that Repa had a vest on, but it did not flash. Also, Mr. Napierkowski and both Proper and Sherretts could not recall a flashing vest.
4. Mr. Repa was trained in traffic control and should have had his attention on the passing truck and trailer. His own testimony was that he saw the trailer coming but just did not move. His testimony was confirmed by Fire Police Officer Steven G. Klakamp. Klakamp testified that Repa had enough room to get out of the path of travel of the trailer. This was also confirmed by Repa's own expert report. The expert report stated that there would have been 5 feet of space between the trailer and guiderail.
5. Frank Napierkowski testified that as he was making his turn, he saw Mr. Repa in his mirror, standing approximately 10 to 12 away from his trailer. He also testified that as his trailer turned, he looked in his mirror again and did not see Repa. Mr. Napierkowski also testified that he was keeping a look out ahead. He testified that he was unfamiliar with the area and did not want to end up in a ditch.
6. Commercial operators have a duty to keep a look out. In this case, Mr. Napierkowski was scanning his mirrors as well as keeping a look out to make sure his truck and trailer did not end up in a ditch. The driver does not have a duty to stop his travel if he does not see a threat in his mirrors.

7. It is asserted that Frank Napierkowski would have seen Mr. Repa standing to the rear of his trailer. Due to the disputed testimony about Mr. Repa's lighted vest, I cannot definitively state one way or the other whether he had a lighted vest. However, based on the testimony about how Mr. Repa was standing, he was facing the trailer, the flashing lights would not be turned toward Mr. Napierkowski. Also, the flashing LED traffic wand could have been to Mr. Repa's right side. With the wand at this position, the wand would be obstructed by his body. Even if the lights were flashing off of the trailer, they could be easily be mistaken for the trailers flashers which we know were activated.
8. If Mr. Repa had on a non-lighted safety vest, Mr. Napierkowski would definitely not see Repa in the dark conditions.
9. Utilizing the turning radii as calculated by Mr. Bizzak, I placed an exemplar Tractor and Tanker Trailer into a scale CAD diagram of the intersection. Based on my measurements, Mr. Knapierkowski's trailer would have been approximately 10 feet away from the guiderail. This distance is confirmed by the testimony of both Napierkowski and Fire Police Officer Steven G. Klakamp. Napierkowski testified to being 10 to 12 feet away and Klakamp testified to the trailer being 8 to 10 feet away. **(Exhibit 1)**
10. Mr. Bizzak's report states that Zilhaver Road is a narrow roadway with a width of 18.5 feet. This measurement had to be taken approximately 90 feet east of the intersection.
11. The width of Zilhaver Road at the intersection is 70 feet. 25 feet east of the intersection, the roadway width is 35 feet. Therefore, this intersection is actually of adequate size to handle a turning 57-foot tractor trailer combination.

12. Robert Repa was trained as a Fire Police Officer. He was directing traffic at the road closure on May 2, 2017. Mr. Repa failed to follow his training and failed to move to a place of safety as the truck and trailer proceeded into and through its slow speed left turn. Mr. Repa's failure to follow his training and stay out of the path of travel of the turning truck and trailer is the direct cause of this crash.